and Mr. Barkat Ali to ask this court to reverse the District Court's Grant of Summary Judgment to Harrison Company on its Breach of Contract and Breach of Guarantee claims. The issue before this court is whether a material fact dispute exists as to one key question. Who sold goods to A-Z from October 2018 to March 2019? Was it Imperial or was it Harrison? The District Court found it was Harrison and granted summary judgment on that basis, but there are three key groups of documents that unequivocally proclaim Imperial sold goods to A-Z. These are Imperial's UCC financing statements, its March 2019 demand letter, and its state court lawsuit on the exact same invoices that Harrison now seeks to recover on in this lawsuit. But there's other evidence in the record that further elaborates on the fact disputes that exist on performance here. We have changing invoices and statements. We have payments made only to Imperial. And we have Harrison's May 2019 demand letter that suggests that Harrison was only acting as a supplier and Imperial delivered the goods. So again, the question before this court is, is there a material fact dispute on performance? Do you dispute that Harrison and Imperial never merged and remain two separate entities? No, Your Honor. We do not dispute that they remain two separate entities. That's undisputed. That is undisputed, yes, Your Honor. And at a minimum, all the fact issues, as I was talking about this evidence, all of those fact issues should have precluded summary judgment here. So let's first turn to those key documents I mentioned in the opening. Imperial's UCC financing statements. Let's look at those first. These are in January of 2018 and August of 2018. Now, both of these were before the invoices at issue here. But at a minimum, establish a fact question as to AZ's and Imperial's business relationship. So these UCC financing statements list AZ as the debtor and Imperial only as the organization holding the debt. No mention of Harrison in these financing statements. They say all equipment and inventory furnished or sold by Imperial is the collateral on these UCC financing statements. And again, Imperial is the only entity mentioned here, not Harrison. So at a minimum, establishes that there's some sort of at least a fact dispute as to a business relationship between Imperial and AZ with Imperial as the seller. Now, next we'll move to Imperial's March 2019 demand letter. This was preceding the lawsuit that was filed in state court by Imperial. Again, no reference to Harrison in this demand letter. And it says AZ owes Imperial and Imperial alone the $2.5 million debt being sued on here by Harrison. And it asks AZ to remit payment only to Imperial. So then Imperial follows that up with a state court lawsuit against AZ, again on the exact same invoices that Harrison now tries to collect on. This was a breach of contract and suit on account. And in this state court lawsuit, there are verified statements by Imperial CFO that say that Imperial was the performer. I'll read a couple of those. Imperial has performed all conditions precedent and Imperial has suffered damages for the goods sold and delivered by Imperial from October 22nd, 2018 to March 4th, 2019. Defendants ordered from Imperial. Are you making some kind of judicial estoppel argument based on these statements? No, Your Honor. We are not saying that these are judicial admissions. We are saying these are inconsistent statements that create a fact dispute. Well, are they evidence in this case, summary judgment evidence in this case, or are they just statements in another case that was non-suited? Your Honor, these were entered as summary judgment evidence. They are in the record for this case. This pleading was entered into the record as an example of verified statements from Imperial that said Imperial was the seller of goods here. And so we have not only these verified statements that come from Imperial CFO, but we have the demand letter and we have the financing statements on top of that, both of which predate that lawsuit and still can be considered, regardless of whether that lawsuit is considered for judicial estoppel purposes. The other side disputes that a UCC1 financing statement is competent summary judgment evidence, uh, I mean to, I guess to, to, to show performance by Imperial over Harrison. I mean, what is your response to that? Your Honor, again, with the UCC financing statement, it's in the same sort of vein as this judicial estoppel issue. We're not using it to say that as a matter of law, there was an agreement between AZ and Imperial. It's being used to say that there's inconsistent positions here. Is there, is that, is it evidence that there is an agreement between AZ and Imperial versus Harrison? Is it even evidence of that? Well, I'm trying to get at what is a UCC1 financing statement actually go to show? Your Honor, I think it is evidence as to Imperial's position on who was selling the goods here. So whether it specifically showed a contract or whether it is admissible to show as a matter of law that there was a contract is less of an issue of whether there's any inconsistent positions that Imperial took. I'm just curious, where's the UCC financing statement in the record so I can look at it? Yes, Your Honor, I have it. It is at the record at 3101 and then 4177. Thank you. And one other point on that, the Green Street case that was cited by both the district court and opposing counsel is clearly distinguishable. In that case, the filers of the UCC statements were actually trying to use that statement to financing statement that it is a seller of goods to Imperial or to AZ and now trying to walk that back. Very different situations and Green Street was the only case relied on by the district court for why these UCC financing statements could not be considered. You're not trying to, you're not saying it proves an agreement? As a matter of law, no, Your Honor. As a matter of law, it's proof, proof might. It is evidence, yes, Your Honor. You're saying it is evidence of agreement? It is evidence of Imperial's position that it was selling goods. The contours of that agreement, we would say, are established by the invoices that were sent from Imperial, the shipping manifests, and that and the like. But this does establish that Imperial at least laid claim to that collateral as a seller of goods. And again, that's the material fact question before the court is who's a seller of goods here. And aside from those, so we have these three key documents and then we have other of invoices, shipping manifests, and statements. All of it is about Imperial. It says payment is to be remitted to Imperial and there's no dispute that that's exactly what happened. All the payments were remitted to Imperial for the invoices at issue here and those payments were deposited into Imperial accounts. The other piece of evidence I'd like to draw the court's attention to is Harrison's demand letter. Now this is post-state court lawsuit by Imperial, May 2019. In this demand letter, it says Harrison supplied through Imperial. Now it also says Imperial delivered those products. So this concept of Imperial delivering is very important to counter the evidence from Harrison and its employees that Harrison was the only one that delivered product to AZ. That is not what Harrison's 2019 demand letter says. It says Imperial was actually the deliverer of product and Harrison was only supplying through Imperial. Now what does that mean? Does that mean Imperial was the forward-facing customer entity, i.e. the seller? That's what it sounds like from this letter. And again, all we have to prove is a fact dispute for remand here in trial. Harrison as the supplier does not mean Harrison as the seller and the guarantee must be strictly construed in favor of the guarantor. Here it says agreement, that agreement applies only to sales made by Harrison to AZ. And Harrison supplying through Imperial does not mean Harrison was the seller to AZ. So again, another piece of evidence in the large rubric of evidence we have here that creates a fact dispute as to who was actually selling. I can turn to the June 15, 2018 audit letters. We have several audit letters in the record as well. All of those come from Imperial. They're on Imperial letterhead with the Imperial address underneath. They're signed by Brad Prendergrass with Imperial Trading Company LLC underneath. And there's a dispute. I wanted to go back a little bit to the lawsuit that we talked about briefly and following up on Judge Duncan's question. There's a lot of dispute about this all being a mistake. The lawsuit, the UCC financing statements, this was all a mistake that pivoted from something that went wrong in Imperial's internal accounting or some such. But whether that lawsuit, the UCC financing statements, whether that was a mistake isn't of itself a material fact dispute. We dispute that that was a mistake. We actually think that Imperial owned these invoices, was owed the debt, and filed that state court lawsuit as a result. And the only reason that lawsuit was non-suited, and mind you, non-suited without prejudice, was because Imperial did not have a guarantee with Mr. Ali. But Harrison did have a guarantee with Mr. Ali. So— Well, I guess to put the shoe on the other foot, I mean, there's no dispute here that how much is owed for the sales of the goods, two-point-something million dollars? For this lawsuit, there is no dispute. No dispute about that. I'm assuming there's also no dispute that your client hasn't offered to pay Imperial for that. Has not offered to pay that, Your Honor. Harrison is the— Yeah, but your theory is that Imperial was selling the goods, not Harrison. Yes, Your Honor. I mean, you haven't offered to pay Imperial. No, Your Honor, that's true, yes. Okay, so the whole point here is that Imperial doesn't have—the guarantee isn't with Imperial, it's with Harrison, and so therefore Mr. Ali would not be on the hook for the guarantee, right? Yes, Your Honor. Our position is that Imperial was the one selling the goods, and so that would not trigger the guarantee. I mean, there's—I guess what's the sort of background story? I mean, you know, what's the story you would tell at trial about this? I mean, there was a contract, a credit agreement between Harrison and AZ, but now because of the restructuring of the companies, the seller was actually Imperial, not Harrison. Yes, Your Honor, and Imperial basically took over Harrison's selling goods, and that's evidenced by the change in the invoices that we have that used to say Harrison in big, bold letters. Now everything says Imperial, and the statements that we get, payments being made only to Imperial, Imperial filing suit on those invoices, all of that aligns with Imperial taking over. But there's no question about what the legal relationship is between Imperial and Harrison, right? That's why I asked you first. There's no question that they merged. One of the cases you rely on is Marshall, but that's a merger. Yes, Your Honor, that is a merger case. So there's no question that this is not a merger. I mean, Harrison and Imperial are separate entities. There's a relationship between them, no doubt. I assume it's undisputed what it is. So, you know, I'm just—what I'm saying is, you're saying that there's evidence that suggests, in your view, that Imperial was the one doing the selling after a certain point. Yes, Your Honor, and I think a key piece of evidence that the court needs to keep in mind is that Imperial asked for new guarantees. So Imperial asked for new guarantees from Mr. Ali. Where's—I don't remember that. Where's that in the record? Let me find that. I believe it is—I'm sorry, I'll have to get back to you with that. You're saying there's evidence that Imperial asked for new guarantees. Yes, and that's also in the briefing, and it was not responded to by opposing counsel. All right, well, we'll ask opposing counsel about it. Yes, Your Honor, it is, and that is in the record that there were new guarantees asked for. Mr. Ali said no, he would not give those new guarantees, and Mr. Ali stepped down from the company in 2018. So this is a situation where we have a gentleman who was asked for a new guarantee, did not grant it, from Imperial. Now, why would Imperial do this if this was business as usual? If Harrison was going to continue to sell after the merger, and there was no indication that Imperial would— It wasn't a merger, though. I'm sorry, after the acquisition. Excuse me, thank you for correcting me there. After the acquisition, if there was no change, and it was going to be business as usual, Harrison continuing to sell for AZ, there would be no need to ask for those new guarantees. And yet, they were asked for, they were—Mr. Ali said no, and then we have a situation now where we have UCC financing statements again that say Imperial was selling the goods, all of these invoices, all these statements, and a lawsuit with verified statements within it saying that Imperial was the seller of goods. And so I think the other thing we need to look at is this October 2014 letter, and that really talks about this acquisition. It gives every indication it was coming from Imperial, and talks about Harrison undergoing a name change to Imperial Bossier City. But again, the record is undisputed that Harrison stayed Harrison. It um, there's no evidence documenting an official name change. The Louisiana State Court records all say Harrison. And this, and the other side disavows that Harrison became a division of Imperial. So then we have a question of what does this little statement Bossier mean on all these invoices, all these statements? What does that mean? It could mean a couple of things. It could mean that the warehouse in Bossier City has now become a distribution center for Imperial. It could mean that Harrison is supplying to Imperial, and Imperial is the customer-facing entity, the seller. And in fact, Harrison's demand letter in 2019 backs that up. Harrison was selling through Imperial, Imperial was a deliverer of goods. And that is also supported by opposing counsel's own position that everything was being done to promote Imperial's brand. So Imperial, everything again, Imperial taking over, Imperial taking over, Imperial the customer-facing entity. And this has real consequences for someone with, like Mr. Ali, who has a guarantee only with one of these entities. If he doesn't know who is contracting with AZ, he's on the hook for purchases he had no idea he would be on the hook for. So there's other underlying issue here related to whether it's fair for Mr. Ali to have to pay on a guarantee when every inconsistent statement, all of the evidence from, of the fact issue comes from Imperial itself. Are you saying Mr. Ali wasn't aware that AZ was buying $2.5 million worth of tobacco products? I'm saying at that point, he had stepped down from the company from these, when these invoices are at issue. So he had stepped down from the company and was no longer involved in the company. And here, the bigger point is that a party deserves to know who they're contracting with. And this bait and switch by Imperial to give every indication that it's Imperial who is the seller of goods and not Harrison really leaves someone like Mr. Ali with a guarantee only to Harrison at a great disadvantage. Why? What's the disadvantage? Because he would have no idea when everything objectively, and any reasonable buyer would think from the objective evidence before AZ that it was buying from Imperial, when in fact Harrison was the one that is now saying it was the seller and therefore Mr. Ali is on the hook for the guarantee. He's not on the hook for the guarantee if the sales came from Imperial. And again, all of the objective evidence is what that actually, that was what was actually occurring. I see that I'm out of time. May I briefly wrap up? No, you say time for a vote. Okay. Thank you, Your Honor. Okay, please the Court. I'm Tom Luce. I represent Harrison. I want to begin by following up on some of the questions that you had, Judge Duncan. You're correct that there were agreements between A to Z and Ali and Harrison. There was never a merger between Imperial and Harrison. They are now and have always been separate companies. And defendant's argument is somehow something changed after Imperial merged with Noble Feldman, which at the time was Harrison's sole member. At that time, and so to back up one step, the defendants do admit that A to Z received the goods that it ordered. They do admit that they owe two and a half million dollars. They contend that they owe that money to Imperial, not to Harrison, but they haven't paid Imperial either. And counsel is correct. The only issue in dispute in this case, the only issue, the only element of Harrison's claims that defendants challenge is whether Harrison was the entity that performed under the credit agreement. The evidence is undisputed that Harrison was the one who performed. And I want to talk about some of the evidence that we put in that came from the persons who were employed by Harrison who were the hands-on people fulfilling A to Z's order. I want to start with Daniel Burgos. His declaration is in the record. He's a sales manager for Harrison since 2014. He was A to Z's account manager since 2017. Mr. Burgos states, and this is a quote, I know that every A to Z order Harrison received during my time as A to Z's account manager was filled by Harrison from Harrison's warehouse in Bossier City, Louisiana, and that Harrison delivered those products to an A to Z warehouse in Dallas. Next, Christopher McClure, who is Harrison's director of warehouse operations in Bossier. He's been an employee of Harrison since 2014. Mr. McClure says, Harrison employs everyone who works in the Bossier City warehouse. Harrison buys and owns all of the inventory in his Bossier City warehouse, and every A to Z order filled by Harrison from its inventory in its Bossier City warehouse, every A to Z order was filled by Harrison from inventory in its Bossier City warehouse. And yet, Harrison told A to Z to make the checks out to Imperial, and the manifest said that A to Z was responsible for paying Imperial. Manifests do say that. That's undisputed. In 2015 and 2016, Harrison and Imperial integrated their accounting function, and Harrison's manifest did direct its customers to make payments to Imperial. Those payments were received by Imperial, but the payments were credited to Harrison's general ledger. The invoices, statements, manifests all maintain distinctions between shipments from Harrison and shipments from Imperial. The way they did that, and there's no fact dispute about any of this, all of the statements, manifests, and invoices say Imperial on them. They all also say and in his 2014 letter, October 30th, 2014 letter, Wayne Bacquet, who was the president of both Harrison and Imperial, told all of A to Z's customers that Harrison would be doing business as Imperial Bossier City. That's where Harrison is located. It also said in that letter, your Bossier City team will continue to provide you customer-driven service. Bossier City team, there's only one Imperial-related entity in Bossier City, and that's Harrison. Mr. Bacquet's 2014 letter said, we're going to do business as Imperial Bossier City, and that's exactly what happened. The integration of the accounting, however, was kept separate. For Harrison sales, the money that was remitted to Imperial was credited to Harrison's account on Harrison's general ledger. The integration of the accounting is an internal change that happened between Harrison and Imperial, but that's no evidence that the actual goods sold to A to Z came from Imperial. The undisputed evidence from Mr. Borges, Mr. McClure, and Mr. Faley, who was also the transportation manager at Harrison, all three testified, we filled every A to Z order from inventory we owned in our Bossier City warehouse, and there is no evidence that Imperial provided the goods, sold the goods to A to Z. And I want to touch on that. That's an argument that came out in the defendant's reply brief. They say, Ali's guarantee covers goods sold, not merely supplied by Harrison. In the context of this case, those words are synonymous, and I want to point or direct the court's attention to the way Harrison framed that issue. Harrison framed the issue by saying, Harrison performed under the credit agreement with A to Z, i.e., it supplied A to Z with goods A to Z ordered under the credit agreement. Supplying the goods, and it's my briefing, when I write that Harrison supplied the goods, I'm saying Harrison performed under the credit agreement. And if I use the wrong word, that's on me, but it's obvious from the way I framed the issue that that's what I'm talking about. Excuse me, Mr. Luce. I mean, it's obviously important that there's evidence in the record that supports your side, but this is on summary judgment. So the argument on the other side was effectively, look, there's evidence that creates a genuine dispute, a fact, a material fact as to whether it was Harrison or Imperial selling the goods, and they pointed to, if I'm not mistaken, the UCC1 financing statement. They pointed to a demand letter, I think from 2019, and they also point to the state court lawsuit and the statements made in the state court lawsuit that was non-suited on behalf of Imperial. So, of course, if those create material fact disputes as to who was selling them, we would have to reverse. I think you'd agree. So what is your response to each one of those points? None of the facts on which the defendants rely create a material fact dispute about which entity was actually selling or supplying or providing the goods to A to Z. She started off with, or counsel started off, my colleague. Don't worry about it. I mean, so I'm looking at the UCC financing statement here, so what's the, I mean, I see Imperial Trading Company on it, I see AZ Wholesalers on it, I see, you know, it's claiming an interest in Collado, so why doesn't that show that, no, it was actually Imperial that was selling? That reflects a mistake by Imperial, and the state court lawsuit was a mistake by Imperial in asserting the claim, and in particular, I'd refer to the state court petition. It refers to Harrison as a predecessor in interest or a predecessor of separate entities, and so if you start with the mistaken impression that Harrison is merely a predecessor of Imperial, it's understandable, and the district court found entirely plausible that Imperial could make that mistake. Mr. Prendergast, in his declaration, said, we relied on outside counsel to file the state court lawsuit. Imperial doesn't have an in-house counsel, and so that lawsuit was filed. There just isn't a fact dispute about that case, about the UCC filings, about the demand letters. It simply reflects a mistake that was made by Imperial at the time. That mistake, however, does not implicate the fact question of who delivered or sold goods to A to Z, and the undisputed facts show that that was Harrison, not Imperial, and the same is true with the invoices or the statements or the manifests. They all say Imperial on it. They also all say, as relevant here, Bossier, meaning Imperial Bossier, just like in Mr. Beckett's 2014 letter, Harrison was doing business as Imperial Bossier City. All of those invoices are distinct and relate only to Harrison, not to Imperial, and Judge Smith, you correctly pointed out, payments were undisputably made from A to Z to Imperial, but it is also undisputed that those payments were credited to Harrison's account for sales that Harrison made, and so I think what the defendants are really saying here is we have undisputed facts, but arguing for a different legal conclusion doesn't reflect a material fact dispute that would preclude summary judgment, and so I think that is true of all of the issues that counsel raised. None of those facts are in dispute. The invoices say Imperial. The statements say Imperial. The manifests say Imperial. They all also say Bossier. There is no fact dispute about the state court filing by Imperial. That was a mistake that Imperial made, and it's uncontroverted that it was a mistake. It was premised on the same credit agreement and guarantee that's at issue here, and that credit agreement and guarantee are indisputably between Harrison and A to Z and when that led to a mistaken assertion of those claims. On the timing of this, when did the integration of Harrison and Imperial take place? I missed what you said. When did the integration of Imperial and Harrison take place? I know it's not a merger. Imperial merged with Noble Feldman in 2014, and the integration of the accounting function occurred in 2015 and 2016, and part of that integration required Harrison to issue new account numbers for A to Z, and so the new accounting system or Imperial's accounting system required a five-digit account number instead of a six-digit number. Harrison's old numbers with A to Z were six-digit numbers. They transitioned that to five-digit numbers, and from May 2015 until August 2016, all of the invoices that Harrison sent to A to Z had both the old six-digit number, Harrison's customer number, and the new five-digit number. After August of 2016, they dropped off the old six-digit number, so the integration process started after the merger between Imperial and Noble Feldman, and that was occurring in the 2015 timeframe. And when—I know in your view it's Harrison that was selling the goods that racked up the $2.5 million. When did that stop? When did the sale of goods to A to Z stop? Harrison stopped selling goods to A to Z in 2019. 2019, okay. And I think the invoices in dispute in this case are either from the 2017 or 2018—I don't recall exactly—timeframe until Harrison stopped selling goods to A to Z. Okay. Is there any evidence—I expect the answer is going to be no, but I need to ask—is there any evidence that—okay, so in your view, Harrison is selling the goods. Is there any evidence that Imperial is also selling goods to A to Z? I know they sell goods elsewhere, right? No, Your Honor. There's no evidence that Imperial sold anything to A to Z ever. Okay. And the evidence that comes from the people on the ground, the people that worked in the city, and the sales manager from Harrison all says, we did it. Harrison sold this stuff. And there's no evidence that Imperial sold something. There is evidence of a mistaken lawsuit and a mistaken assertion of that claim. So is another way of saying what you're saying is that the evidence shows that what was sold to A to Z is from the Bossier warehouse? The only evidence is that everything that was sold— I guess the only presence, if that's the right word, of Imperial in Bossier is what? I mean, how is Imperial present in Bossier? Or is it not? Imperial is not. It's not. It's Harrison. Harrison is in Bossier. And the Imperial is the more prominent brand between Imperial and Harrison. And I think part of the integration of these certain functions, they decided we're going to promote the Imperial brand over the Harrison brand. And that's why you see Imperial written on the side of a truck. The trucks do say Imperial, undisputed fact. They also say Harrison. They also have the Department of Transportation number that Harrison registers with the DOT. They are driven by Harrison drivers, Harrison employees. What you told us a few minutes ago, as I understand it, at least what I wrote down, was that Harrison was doing business as Imperial of Bossier City. Is that what you told us? Yes, sir. That was how they presented themselves. It was a DBA, doing business as? Yes. I think that's— I'm not arguing with you. I'm just asking you, is that what you told us? That's fair, yes. And so you see all of the statements at issue and all of the invoices at issue in this case do say Imperial on them. That's not a disputed fact. They also, and it's undisputed, say Bossier. When they say that, that means Harrison. And when a payment's remitted for an Imperial Bossier invoice, it's credited to Harrison. That fact is also undisputed. So I think, to sum up, Harrison proved its claim in this case through the testimony, among others, of Mr. Burgos, McClure, and Phelan. Also, Mr. Backhase and Mr. Prendergrass' declarations are consistent with that, that Harrison was the one who sold the goods to A to Z. None of the issues that defendants raise create a fact issue on that question. Who sold the goods to A to Z? There is no dispute that Imperial filed the lawsuit. It's a mistake. There's no dispute that the invoices say Imperial. There's no dispute that payments were remitted to Imperial and then credited to Harrison. None of those facts are in dispute. None of the facts that the defendants raise support an affirmative defense. And I don't understand counsel to have argued there's an affirmative defense issue here. And there's no legal theory under which any of those facts would defeat Harrison's claim in this case. If the Court doesn't have any further questions, I'll release the rest of my time. All right. Thank you, Mr. Chief Justice. Ms. Bills, you've saved some time for a vote. Do you dispute that all the orders were filled from the facility in Bossier? Yes, Your Honor. Harrison's own demand letter disputes that. So if we look at Harrison's May 2, 2019 demand letter, it says Harrison's— No, but I'm asking you whether you and your client dispute that. Do you say that that was not true, that all the goods were distributed from Bossier City? Your Honor, I think they may have come from Bossier City, but who was selling them is the question. Well, we just heard—I'm sorry, go ahead. Well, so the answer to my question is, yes, you acknowledge that all the goods came from Bossier City. From the invoices that we have in dispute, they all say Bossier on them. We don't know how they internally fulfilled orders, so it's hard— But you do not differ with that. You do not dispute that. You do not say to the contrary that no, so there were some goods that did not come from Bossier City. Your Honor, I don't know of any evidence in the record that would directly refute that particular piece, but what is refuted is who was selling those orders and where that evidence was— So what I was going to follow up is, if it's not disputed that the goods were coming from Bossier, Imperial, as an entity, isn't selling anything from Bossier, are they? Your Honor, it says in that demand letter that Imperial was— 2AZ, and— Yeah, but we just heard that they're doing— Sure, they're doing business. Their name— They have a DBA as Imperial Trading Bossier or whatever it is. But Imperial, as an entity, isn't selling goods out of Bossier, are they? Your Honor, if I can come back to the evidence in the record, we have the demand letter that talks about Harrison supplying through Imperial and Imperial delivering the goods from Bossier. That's what their own demand letter says. And then we have the financing statements, all of this evidence that says Imperial was the one performing in the state court lawsuit. Now, opposing counsel wants to claim that this was all a mistake, but this was not a typo. These were verified statements from Imperial's CFO again and again and again and again that say Imperial was the one performing. And at the end of the day, the guarantee has to be strictly construed for Mr. Ali, and seller means seller. If Imperial is the customer-facing entity and the seller, there's a material fact dispute there as to who sold goods to AZ— Does Imperial, as an entity— and I say that because Harrison's a separate entity— does Imperial sell from other locations? Yes. Sell goods from, I mean, in Texas or Georgia? Yes, Your Honor. They have their own clients. They sell across— they have a much broader base, I would say. They're the bigger company. Than Harrison. They're a regional company. Maybe they're a national company. Yes, and that's opposing counsel's own position. Well, this was all an effort to boost Imperial's branding, and I think that just comes back to everything to us was Imperial, and they filed lawsuits. They did all these different things. The one other thing that I wanted to mention in response— I'm sorry, may I provide the record reference for— No, no, no. Your time has expired. You chose to save only three minutes for rebuttal, so you used that. Yes, Your Honor. We would ask that you reverse. Thank you. Thank you, Ms. Bills. Your case is under submission. Next case for today, James v. Cleveland.